UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAUREEN THERESA MARTIN, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 15-10313-LTS |
| CAROLYN W. COLVIN, *Acting Commissioner of Social Security* | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER ON MOTION FOR
ORDER REVERSING DECISION OF COMMISSIONER (DOC. NO. 15)
AND MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (DOC. NO. 23)

June 7, 2016

SOROKIN, J.

Plaintiff Maureen Theresa Martin ("Martin") brings this action against Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("The Commissioner"), asking this Court to either reverse the final decision of the Commissioner and award benefits or, alternatively, remand for further proceedings. Doc. No. 15. The Commissioner moves to affirm her final decision. Doc. No. 23. After careful consideration of the parties' briefs and arguments, Martin's motion is DENIED and the Commissioner's motion is ALLOWED.

I.    BACKGROUND

    A.    Facts

Martin, a fifty-five-year-old woman born October 25, 1960, has never married, has no children, and lives alone in a studio apartment. Administrative Record ("R.") at 38, 39.[1] Although Martin has a driver's license, she does not own a car; rather, she walks, takes public transportation, and relies on family members. Id. at 40-41, 291. After graduating high school, she completed one year of secretarial training, but did not finish the program. Id. at 39, 40, 45, 446. Following high school, she worked part-time at a library for five years. Id. at 39, 40, 45.

Martin last worked in August 2009, when she was laid-off as a temporary employee at Dural Juvenile Group. Id. at 23. For 2.5 years, she assessed the quality of children's products pre-shipment and processed returns. Id. at 45, 56-59. For three to four years prior to 2005, Martin had, sporadically, similar employment with First Year. Id. She also worked for a book bindery. Id. at 59.

Martin has actively sought employment by going to the local career center and library. Id. at 45-46. She testified that her previous jobs ended due to difficulties working with co-workers. Id. at 60-61. Her qualifications and lack of transportation have limited her job search. Id.

Martin has been diagnosed with Asperger syndrome, obsessive compulsive disorder ("OCD"), adjustment disorder with depressed mood, and anxiety. Id. at 104, 460-68. Martin also hoards, and has done so since at least 1999. Id. at 50, 454. Hoarding has caused issues with landlords, resulting in evictions in 2003 and 2013. Id. at 61, 62, 454. Martin received treatment at South Bay Mental Health Center ("SBMHC") from April to November 2007, where clinician Kevin Hershey recorded Martin's OCD and episodic hoarding. Id. at 306, 308.

---

[1] The Administrative Record is found at ECF Doc. No. 14. The Court uses the pagination found in the original Administrative Record.

On August 8, 2011, Martin's primary care physician, Tinah Canda, M.D., completed a psychiatric disorder questionnaire, noting "none reported/known." Id. at 263-64. On August 15, 2011, Martin returned to SBMHC, where she sought weekly, hour-long, therapy sessions with Randall Richard ("Richard"), M.A. Id. at 279-92, 302-21, 324-31 372-89. Richard conducted an initial intake evaluation. Id. at 302-15. He noted that Martin is a "pack rat" and hoarder, with misdirected anger that impairs her functioning. Id. He further noted that she wears a full set of dentures due to years of neglect. Id. at 309. Martin's trauma history noted that she is disheveled, over-talkative, irritable, anxious, and obsessional; and that she has a short attention span, loose thought processes, and impaired concentration; demonstrates inappropriate facial expressions and changeable moods; and has no social circle of friends. Id. at 310-11. While seeking treatment, Martin filed applications for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") payments with the Social Security Administration ("SSA") on September 19, 2011. Id. at 173-81, 182-85. Both applications alleged a disability onset date of September 1, 2009. Id. at 173, 182.

On October 12, 2011, Richard prepared a Psychiatric Disorder Questionnaire. See id. at 290. Martin continued to experience severe symptoms resulting in deficiencies in work behavior and difficulties in activities of daily living. See id. at 290-91. Her symptoms included poor judgment and inflexibility. Id. Martin was able to remember work-like tasks and instructions. Id. On certain days, Martin was not able to get out of bed. Id. at 291. She was fired from jobs for being overly talkative. Id. She self-isolated and fought with neighbors. Id. at 291-92.

Per the request of the Massachusetts Rehabilitation Commission, Dr. Edward Powers ("Powers"), Ph.D., conducted a ninety minute psychodiagnostic interview with Martin on December 12, 2011. Id. at 295-98. Martin described her average day as extending from 8:00

3

AM to 11:00 PM, and as primarily home-based. Id. at 297. Each day, she attempts to clear her apartment, and would watch television as a leisure interest. Id. Martin arrived to the interview adequately groomed, but appeared to be in emotional distress, speaking rapidly. Id. Powers noted episodic anxiety with OCD features, and some depression given both her current circumstances and continued bereavement over her father's death. Id. Attention and concentration proved unimpaired, and judgment and social reasoning appeared within normal limits. Id.

On December 27, 2011, James Carpenter ("Carpenter"), Ph.D., the state agency psychological consultant on initial consideration, diagnosed Martin with individually "non-severe" affective disorder and anxiety-related disorder, and determined that the combination of impairments was severe. Id. at 69-87. Carpenter reviewed Richard's Psychiatric Disorder Questionnaire from October 10, 2011 and Power's psychodiagnostic interview from December 12, 2011. Id. at 72. Under the Paragraph B criteria of the listings of Appendix 1, Carpenter found the following: moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Id. at 73. Thereafter, Martin's initial request of SSI / SSDI benefits was denied on December 27, 2011. Id. at 123-25. On March 13, 2012, Robert Lasky, Ph.D., a state agency psychological consultant on reconsideration, affirmed the assessment of Carpenter. Id. at 88-109. Request for reconsideration of SSI / SSDI benefits was denied on April 4, 2012. Id. at 126-28. Subsequently, on April 13, 2012, Martin filed a request for hearing. See id. at 129.

Richard referred Martin to licensed psychologist Cary P. Gearhart ("Gearhart"), Ed.D., who saw her for a one-hour evaluation on April 23, 2012. Id. at 335-40. Gearhart noted that

Martin was suggestive of emotional confusion, poor social development, and a dearth of internalized psychological structures.  Id. at 339.  He noted that Martin thinks about her experiences in a highly inflexible manner, and evidence suggested difficultly in modifying her perspective about herself or events in her life.  Id.  Gearhart diagnosed Martin with OCD and Asperger's.  Id.

From May 23, 2012 through February 26, 2013, Martin continued receiving treatment at SBMHC, now with Kimberly Sawusch ("Sawusch"), L.C.S.W., and Mallory Centonze ("Centonze"), M.S.  Id. at 394-408, 417-40.  While Sawusch's primary focus included motivational interviewing (to encourage cleaning and job hunting) and psychoeducation (concerning social skills, Asperger's, and sensory issues), Centonze conducted psychotherapy with Martin.  Id.

On October 29, 2012, Martin was assaulted in her apartment.  Id. at 409.  She suffered Post-Traumatic Stress Disorder ("PTSD") from this incident.  Id.  On March 3, 2013, Martin's family took her to the Morton Hospital Emergency Department due to concerns about her not taking care of herself.  Id. at 460-68.  Martin was experiencing heightened stress levels due to her impending eviction and the purging of the majority of her "things."  Id. at 52.  Emergency records noted the following about Martin: suicidal and homicidal ideation; flight risk; pressured speech consistent with a manic episode; cooperative; and extremely dirty.  Id. at 460-68.  The emergency physician recommended Martin be admitted to a psychiatric facility.  Id.

Subsequently, from March 4, 2013 through March 8, 2013, Martin was hospitalized at Lowell Youth Treatment Center, a satellite of Westwood Lodge Hospital.  Id. at 12.  Martin agreed to start medication, and found group therapy sessions helpful.  Id. at 414, 450.  She also participated in family meetings and was provided a lot of family support.  Id.  Martin

5

demonstrated rapid, monotone speech, circumstantial rambling, and odd and poor eye contact. Id. Her Discharge Diagnosis included PTSD, OCD (as a hoarder), and Asperger's. Id. at 415.

On March 15 and 22, 2013, Martin met with Kelly Kugel ("Kugel"), M.A., at North East Health Services for a Comprehensive Assessment. Id. at 444-55. Kugel noted that Martin was not eating or sleeping, and that she had "threatened to hurt her sister." Id. at 449. While hospitalized, Martin was prescribed fluvoxamine for her depression and anxiety. Id. at 450. She was characterized as having "significant impairment in social relationships [and] few friends," and never having a relationship with a partner lasting longer than six weeks. Id. at 451. Kugel also described Martin as hyper-alert, unable to concentrate, and lacking in judgment and insights. Id. at 454.

On March 20, 2013, Dr. Charu K. Patel ("Patel"), M.D., a specialist in psychosomatic medicine, saw Martin for medication management. Id. at 457. Patel diagnosed Martin as having OCD and PTSD. Id. Patel saw Martin again on April 10, 2013, and noted that while Martin had been doing "very well," and had "not engaged in any OCD behaviors," she continued having a "hard time getting rid of things." Id. at 458. The move and medication seemed to have benefited Martin. Id.

At the SSA's request, Patel executed a Residual Functional Capacity ("RFC") form on April 12, 2013. Id. at 441-43. Patel noted the following about Martin: no issues understanding, remembering, and carrying out simple instructions; mild restriction making judgments on simple work-related decisions; moderate restriction understanding and remembering complex instructions; marked restrictions carrying out and making judgments on complex work-related decisions; moderate impairment interacting appropriately with supervisors; marked impairments interacting appropriately with the public and co-workers; and marked restrictions responding

appropriately to unusual work situations and to changes in a routine work setting. Id. at 441-42. Patel also noted that Martin's Asperger's "significantly impairs [Martin's] social functioning," that her OCD has "previously impaired [her] ability to report to work on time and consistently," and that she had "previous difficultly going to work and leaving her home." Id. at 442. Lastly, Patel noted that Martin cannot manage benefits in her own best interest. Id. at 443. Martin continued medication management, and met again with Patel on May 8, 2013. Id. at 459. Martin stated that she was sleeping better, felt more relaxed, and was used to her new apartment. Id.

On May 22, 2013, Martin, represented by non-attorney Michelle Pequita, appeared and testified before the ALJ. Id. at 137. She testified that she is unable to return to work full-time due to her sensitivity towards noise, which easily distracts her. Id. at 43.

B. Procedural Posture

On June 17, 2013, the ALJ found that although Martin asserted OCD–hoarding, PTSD, Asperger's, anxiety, depression, and thumb pain, she was not disabled under Sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. See id. at 18-30. Martin then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on August 14, 2014. Id. at 5-7. Martin then filed this action on February 10, 2015. Doc. No. 1.[2]

II. LEGAL STANDARD

The Commissioner's decision must stand if grounded in substantial evidence. See 42 U.S.C. § 405(g). "More than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)), substantial evidence must adequately support a given conclusion in a reasonable mind. See Rodriguez v. Sec'y of

---

[2] On January 9, 2015, SSA sent Martin a letter giving her thirty days after she received that letter to file a civil action. R. at 1-2. This extension makes Martin's suit timely.

Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Since "substantial evidence" means something less than a preponderance, see Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003), a court will affirm the Commissioner's decision "even if the record can arguably justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). The task of resolving evidentiary conflicts and weighing credibility belongs to the Commissioner and her designee, the ALJ. See Rodriguez, 647 F.2d at 222. Legal errors made while evaluating a particular claim preclude this Court from affirming a denial of benefits. See Manso–Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).

III. DISCUSSION

Before proceeding seriatim through Martin's claims of error, the Court begins with an overview of the guiding legal framework, including the relevant statutory and regulatory provisions. Martin bears the burden of proving her disability within the meaning of the Social Security Act ("The Act"). See Deblois v. Secretary of Health and Human Servs., 686 F.2d 76, 79 (1st Cir. 1982). Under the Act, a claimant seeking benefits must prove an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Only claimants afflicted with disabilities "of such severity" as to render the claimant "not only unable to do h[er] previous work but [also], considering h[er] age, education, and work experience, [unable to] engage in any other kind of substantial gainful work which exists in the national economy," may receive benefits. 42 U.S.C. § 423(d)(2)(A).

To determine disability, the SSA has promulgated a five-step sequential analysis.  See 20 C.F.R. § 404.1520.  The hearing officer (here, the ALJ) must determine: 1) whether the claimant is currently engaged in substantial gainful activity; 2) whether the claimant suffers from a severe impairment; 3) whether the claimant's impairment meets or medically equals a listed impairment; 4) whether the claimant's impairment precludes her performance of any past relevant work; and 5) whether the claimant's impairment prevents her performance of other jobs existing in significant numbers in the national economy.  See id.  The findings discussed in the above summary of the ALJ's decision correspond to the five steps of this analysis.  Having provided the background legal framework, the Court now turns to Martin's four asserted claims of error.

    A.    <u>Substantial Evidence Supports the ALJ's "Meets or Medically Equals" Findings</u>

Martin argues that the ALJ improperly evaluated the record in determining whether the severity of her mental impairments "meet or medically equal" the Paragraph B criteria of Listings 12.04 and 12.06 in Appendix 1.  To meet these criteria, Martin's mental impairments must result in at least two of the following:

1. <u>marked</u> restriction of activities of daily living; or
2. <u>marked</u> difficulties in maintaining social functioning; or
3. <u>marked</u> difficulties in maintaining concentration, persistence, or pace; or
4. <u>repeated</u> episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06 (emphasis added).  The ALJ's decision is holistic, assessing "severity according to the functional limitations" the impairment imposes.  See id. § 12.00(c).

    1.    *Activities of Daily Living*

In evaluating activities of daily living, Martin argues that the ALJ incorrectly found that she is able to live alone and care for herself. Doc. No. 16 at 7. The ALJ noted Martin lives alone, and cares for herself, even though she may not always bathe and change her clothes. R. at 21. He also noted that, although Martin has a hoarding disorder, she is able to maintain her home, perform basic chores, and prepare meals. Id. As daily activities include, inter alia, cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a home, and grooming, 20 C.F.R. § 12.00(C)(2), App. 1, the ALJ discussed and acknowledged the relevant evidence—including evidence of Martin's impairments—and determined that Martin was moderately impaired, based on consideration of all the evidence and explained in his reasoning. Substantial evidence in the record supported this determination, even if the evidence potentially could support other conclusions.

    2.    *Social Functioning*

Martin also asserts social functioning deficits. She argues that the evidence did not support the finding that her social functioning is moderately impaired—either at work or at home, nor did it support the finding that her symptoms are "only moderate" in severity. Doc. No. 16 at 7-8. Martin points out that Patel stated in the RFC form that a "[d]iagnosis of Asperger's Disorder significantly impairs social functioning and interaction with others," and classified Martin as "markedly restricted" when interacting with the public, co-workers, and responding appropriately to work situations and changes in routine work settings. See Doc. No. 16 at 8.

Social functioning includes the ability to get along with others. 20 C.F.R. § 12.00(C)(2), App. 1. A claimant may demonstrate impaired functioning through a history of evictions,

firings, avoidance of interpersonal relationships, or social isolation.  Id.  Cooperative behavior, functioning in work situations, and interactions with the public are also germane.  Id.

The ALJ found that although Martin has a diagnosis of Asperger's, she shops for groceries, attends church weekly, and goes to the library or career center daily to use the computers to socialize on Facebook or search for employment.  R. at 21.  The ALJ consequently indicated in the RFC that Martin was limited to jobs that required no more than occasional interaction with the public, supervisors, or coworkers.  Id. at 21-22.  Martin merely reasserts notes from Gearhart's report that her "affective malaise [ ] interferes with her being able to function effectively," and notes from SBMHC records that she had "misdirected anger" and "snapp[ed]" at people.  See Doc. No. 16 at 7-8.  This does not sustain her burden of establishing that substantial evidence does not support a finding of moderate social impairment in the area of social functioning.

        3.    *Concentration, Persistence, or Pace*

Regarding Concentration, Persistence, or Pace ("CCP"), the ALJ found that Martin has moderate difficulties.  R. at 22.  He noted that Martin is able to handle her own finances and spends up to two hours at a time on the computer.  Id.  The ALJ also observed that although Martin recently had issues of racing thoughts, loose associations, and flight of ideas, Powers' report indicates that Martin was oriented in all spheres and had no memory impairments.  Id.  Martin argues that the record is filled with reference to her flight of ideas, pressured speech, tangential speech, difficulty concentrating, and racing thoughts.  Doc. No. 16 at 8.  She cites the following: Powers' report; Northwest Health Service's records indicating Martin perseverates on obsessive thoughts and had severe flight of ideas; Gearhart's report that she was "terminated from [jobs] or fails the interviews because of unceasing questions and extreme talkativeness";

11

and Gearhart's recommendation for using relaxation techniques to manage intrusive thoughts and reduce interference from compulsions. Id. at 8-11.

Limitations in CCP are best observed in work settings, and refer to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. 20 C.F.R. § 12.00(C)(3), App. 1. An individual may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Id. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this Paragraph B criterion. Id. Although Martin cites Powers' report to argue that a finding of "moderate" impairment is not supported by the record, the report notes otherwise. Powers' report, dated December 12, 2011, states that Martin's "[t]hought appeared normal in process and content," and that she lacked "disturbances in perception." R. at 297. Furthermore, Powers' notes that her "attention and concentration proved unimpaired." Id. This evidence underscores how the ALJ provided an adequate "meets or medically equals" analysis at step three of the evaluation process, and suffices to support the conclusion that Martin's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. See id. at 22.

B.      Reliance on State Agency Psychologists

Martin next argues that the ALJ's reliance on the non-examining state agency psychologists, given that these psychologists did not consider a full record, is not based on substantial evidence. Doc. No. 16 at 12. Specifically, Martin argues that because neither Carpenter nor Lasky considered the objective test results of Gearhart and Patel in making their DDS determinations, the ALJ should not have relied on them. Id. at 11-12.

Martin relies on Chelte v. Apfel, which held that the weight given to a report by a non-treating physician varies on the circumstances. See 76 F. Supp. 2d 104, 108 (D. Mass. 1999) (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991)). One important factor when weighing these reports is "the availability of most of the medical evidence to the non-examining physician." Id. (citing Divirgilio v. Apfel, 21 F. Supp. 2d 76, 80-81 (D. Mass 1998)). In Chelte, none of the evidence of the claimant's symptoms associated with herpes zoster was included in the records DDS reviewers used in making their determinations. Id. The non-examining physicians only reviewed a partial record, never seeing vital information contained in the unreviewed portion, and Chelte held that while the report was noteworthy, this absence precluded it from serving as the sole factor in determining disability. Id.

Here, while Carpenter and Lasky did review a partial record—never seeing the test results of Gearhart on April 23, 2012, the RFC report of Patel on April 12, 2013, and other evidence following the agency decisions on December 27, 2011 and March 13, 2012—the ALJ did not solely rely on their reports in determining Martin's disability status. While the ALJ gave great weight to the non-treating physicians' opinions, he also considered and relied upon the opinions of other medical sources, including Richard, Patel, Gearhart, and Powers. See R. at 22-29. Because the ALJ did not reject the opinions of the alleged "treating" physicians, but rather chose to give them little weight (justifiably, as discussed below), his reliance on the opinions of Lasky and Carpenter was not in error.

  C. The ALJ's Treatment of Martin's "Treating" Medical Sources

Martin next contends that the ALJ should have given deferential weight to the treating physicians' opinions. Doc. No. 16 at 12. She asserts that these records— Richard's treating notes from SBMHC, psychological testing done by Gearhart, and the RFC form by Patel,

13

including hospitalization records from March 2013—collectively illustrate her severe and chronic mental impairment. Id. at 11. Before addressing this argument for each doctor, the Court provides some background legal principles. According to the "treating source" rule, only acceptable medical sources can be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03p, at *45594. Under SSA regulations, "acceptable medical sources" include licensed physicians and licensed or certified psychologists. Id.; accord 20 C.F.R. § 416.913. The treating source rule accords controlling weight to medical opinions of treating sources if their views are well-supported by medical evidence and do not conflict with substantial evidence in the record. 20 C.F.R. §§ 416.927(c), 416.927(d)(2). The Court now addresses each doctor.

    1.  *Randall Richard*

  The ALJ correctly gave Richard little weight. SSA regulations establish that only M.D. degree holders and licensed psychologists can qualify as "acceptable medical source[s]." See 20 C.F.R. § 404.151(a). Because Richard is neither, the ALJ correctly declined to afford his testimony that degree of weight.

  Additionally, even if Richard were considered an acceptable medical source, the ALJ was not required to give deferential weight to his questionnaire. See Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2-3 (1st Cir. 1987) (noting that an opinion "is not entitled to greater weight merely because" it was provided by a "treating physician.") (internal citations omitted). The ALJ may afford less weight to a treating physician's opinion regarding an impediment's nature and severity when "it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Tetreault v. Astrue, 865 F. Supp. 2d 116, 124 (D. Mass. 2012). The ALJ is free to use his

discretion in considering medical and expert opinion as long as he provides "good cause" for his decision. SSR 06-03p, at *6. ALJs not according controlling weight to the treating source opinion must give good cause in the written decision for failing to do so. 20 C.F.R. § 404.1257(c)(2)-(6); SSR 06-03p, at *6; see also Amaral v. Commissioner of Social Sec., 797 F. Supp. 2d 154 (D. Mass. 2010) (finding that opinions of non-examining sources may be given more or less weight than treating sources based on circumstances and may constitute substantial evidence).

Here, the ALJ explained that he gave little weight to Richard's opinions, expressed in his Psychiatric Disorder questionnaire, because they were "inconsistent with the medical evidence as a whole." R. at 28. While Richard opined that Martin had severe symptoms resulting in deficiencies in work behaviors (exemplified by an inability to get to work), and that she had these symptoms since 2007, the ALJ observed that the medical evidence does not support this conclusion: Martin was able to work in 2007; continued working until she was laid off in 2009; attributed her lack of employment, at least in part, to transportation problems; and, contrary to Richard's opinion that Martin has considerable difficulty completing simple tasks, Martin testified that she goes to the library or career center on a daily basis and spends two hours looking for work. See id. These discrepancies support the ALJ's decision to lend Richard's evaluation little weight.

    2.    *Cary Gearhart*

Similarly, the ALJ correctly accorded Gearhart's opinion little weight, as it fell outside the scope of the treating source rule. 20 C.F.R. § 416.902 defines a "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source . . . who has, or has had, an ongoing relationship with" the claimant. Occasionally, an acceptable medical source

who has treated or evaluated a claimant only a few times or only after long intervals may be considered a treating source if the nature and frequency of the treatment or evaluation is typical of the condition. Id. However, if the foundation of the relationship is based on the need for a report in support of a disability claim, that source will not be considered a treating source. Id. Prior to the Psychological Testing Report ("PTR"), Gearhart had never treated nor evaluated Martin. He thus never had the requisite ongoing relationship with Martin to warrant consideration as a treating source.[3]

### 3. *Charu Patel*

The ALJ likewise correctly gave limited weight to Patel's opinion. Patel lacked the ability to offer a longitudinal picture of Martin's impairments. See 20 C.F.R. § 416.927(c)(2). Patel had met with Martin during an extremely stressful and traumatic time—Martin had moved to a new apartment, and many of her belongings had been thrown away—potentially distorting Patel's opinion given the impact of those events. Even if Patel were considered a treating source, she would not necessarily be entitled to deferential weight. As explained earlier, an ALJ is entitled to resolve conflicts in the record, and may reject the treating physician's opinion so long as he provides an explanation. SSR 06-03p, at *6. In this case, the ALJ provided the required explanation, finding Patel's opinion inconsistent with the longitudinal history. R. at 28-29; c.f. Tetreault, 865 F. Supp. 2d at 125 ("In this case, the ALJ provided the required explanation, stating that [the treating physician's] opinion was 'inconsistent with the longitudinal history noted above' and appeared to be based upon 'the claimant's subjective allegations rather than

---

[3] Additionally, even if Gearhart were a treating source, the PTR comports with the rest of the record. The PTR primarily clarifies Martin's diagnosis and recommended a treatment plan—it did not assess work-related functional limitations. See R. at 335-40. Further, the PTR's recognition of Martin's social functioning deficits and impairments in daily functioning supports the ALJ's finding that Martin has moderate social impairments and daily functioning disabilities.

objective findings.'"). Accordingly, the ALJ did not err in giving Patel's opinion limited weight in determining Martin's RFC.

    D.    The RFC Determination

Martin lastly argues that substantial evidence does not support the ALJ's conclusion as to Martin's RFC. See Doc. No. 16 at 13. ALJs must consider all relevant medical and other evidence, including opinions of treating physicians, the claimant's activities, and the claimant's descriptions and observations. 20 C.F.R. § 416.945. This Court's review of the record finds substantial evidence to support the ALJ's conclusions.

Here, the ALJ relied on Martin's testimony that although several mental impairments affected her ability to function in a work environment, she stopped working when she was laid off, not because of her mental impairments. R. at 28. He also observed that Martin has been looking for work since her alleged onset date, that a lack of transportation—not an inability to perform the work she has done in the past—has been her biggest stumbling block, and that she was able to perform certain daily activities around her apartment. Id. He furthermore noted Martin's ability to work for many years in spite of her impairments, as her hoarding behavior has been evident since 1999, and her Asperger's did not develop as an adult. Id. And finally, while finding that Martin's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he found Martin's statements concerning the intensity, persistence, and limiting effects of these symptoms not entirely credible. Id. at 24. Because Martin's claimed inability to perform work-related activities or function independently is inconsistent with the record, see SSR 16-3p, substantial evidence supported the ALJ's determination.

## IV. CONCLUSION

For the foregoing reasons, Martin's Motion for Order Reversing the Commissioner's Decision, Doc. No. 15, is DENIED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner, Doc. No. 23, is ALLOWED.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge